**GIBBS CORP.**
v.
**ARUNDEL CORP.**
No. 14322.

United States Court of Appeals
Fifth Circuit.
Jan. 29, 1954.

Rehearing Denied March 22, 1954.

---

10. 5 U.S.C.A. § 1002.

Marshall S. Scott, Paul R. Scott, Robert H. Anderson, Miami, Fla., Loftin, Anderson, Scott, McCarthy & Preston, Miami, Fla., of counsel, for appellant.

Harry T. Gray, Francis P. Conroy, Sam R. Marks, Jacksonville, Fla., Marks, Gray, Yates & Conroy, Jacksonville, Fla., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RUSSELL, Circuit Judges.

RUSSELL, Circuit Judge.

This appeal arises from a suit by The Arundel Corporation against the Gibbs Corporation to recover compensation claimed to be due it for the dredging of a new dry dock basin and approach channel in the Gibbs Corporation shipyard on the south side of the St. Johns River at Jacksonville, Florida. The dredging operation had been instituted and carried on under the terms of a letter agreement between Gibbs Corporation and The Arundel Corporation by the provisions of which Arundel rented to Gibbs the fully manned and equipped dredge Admiral to perform the work. The parties were in agreement that Arundel had earned the maximum compensation which Gibbs had agreed to pay as rental for the dredge and that this sum should be reduced by certain stated credits. The point at controversy was whether Gibbs was obligated to respond to claims of Arundel for "extra" or additional compensation over and above the rental specified by the contract. Also present is the counterclaim by Gibbs

against Arundel seeking recovery for damage to its marine installations which had resulted from Arundel's alleged negligence during the course of the operation.

The court, having tried the case without a jury, found that Arundel was entitled to recover the balance due under the basic agreement plus additional rental at the rate of $130 per hour for 221 hours, consisting of "7 days of dredging in lieu of blasting", 29 hours delay occasioned by a bent dolphin and idle time of 24 hours due to a shutdown order issued by Gibbs. The counterclaim was in part allowed, but Gibbs was denied recovery for damages to its two bulkheads. Gibbs appeals from the portion of the judgment which granted the additional compensation to Arundel and denied it recovery for the damages to the bulkheads.

■ As to Arundel's claims for extra or additional compensation for the delay occasioned by a bent dolphin and the idle time of 24 hours due to a shutdown order issued by Gibbs, the facts were not in substantial dispute, and answer to Gibb's claim of error in the findings imposing liability for these items rests for final analysis upon the construction and effect to be given to the letter agreement of the parties. Arundel's suit is predicated upon the theory that this contract in effect implies an assurance by Gibbs that Arundel would be provided opportunity for continuous and uninterrupted dredging operations in the performance of the contract so that interruptions, even when occasioned by events

reasonably and normally to be expected in the course of such operation, should be compensated the same as was provided for actual dredging work. The findings of the trial court evidence an acceptance of this view. In this, we think the trial court fell into error, for it is our conclusion that the contract may not be so construed.

By the contract in question, Arundel rented to Gibbs the hydraulic dredge, Admiral, fully manned and equipped for the purpose of dredging a specified area. For this service, Gibbs agreed to pay as rent $150 per operational hour [1] for the first 600 operational hours and $130 for each additional operational hour in excess of 600, provided that the total "cost" of the "job" to Gibbs would not exceed the sum of $150,000, of which amount $10,000 was attributable to mobilizing and demobilizing the dredge. In other words, the maximum amount Gibbs was required to pay under the express terms of the agreement, excluding the fixed incidental fee, was $140,000, and this amount was to be paid only in the event the total operating time equalled or exceeded 984.6 hours.[2] The contract makes no provision for the payment of rent or compensation for non-operating time, but, in fact, limits the payment to actual operational time not to exceed the maximum provided. We find in the record no basis for the allowance of $130 per hour for non-operating time and the provisions of the contract will not properly bear the construction that Gibbs impliedly warrants that there will be no interruptions of operations or that if there

1. Operating time was defined in the agreement as follows: "Operating time covers only the time the dredge is actually digging and pumping dredged materials to the spoiled areas and the period of necessary operational stoppage, including shifting anchors, trash in pump or cutters and failure or breakdown of dredge machinery, amounting to a stoppage of dredging for less than 30 consecutive minutes. Stoppage of 30 minutes or more due to failure or breakdown of dredging machinery shall not be deemed operational time. The dredge is to be allowed one hour of operational time for each 8 hour shift the

dredge is in operation, not for payment, but for making necessary repairs or adjustments. This allowance is to be accumulated over the entire period of the job. However, failures or breakdowns of dredging machinery amounting to stoppage of dredging for less than 30 consecutive minutes are to be deducted from this one hour allowance."

2. This figure is not specified in the contract, but is arrived at by an arithmetical computation based upon the agreed hourly rates as follows: 600 operational hours at $150 per hour plus 384.615 operational hours at $130 per hour = $140,000.

are such interruptions Arundel will be compensated the same as if the dredge had been accruing actual operating hours during such period. Especially is this true since the contract specified an upset price and provided that even this full sum would not be paid in the event the total operating time did not exceed that provided in the contract.

Arundel's third claim for additional compensation relates to the dredging of an area in which rock was encountered in the approach channel between November 15th and 25th, just before the completion of the contract. As to this, the court allowed the claim for "7 days of dredging in lieu of blasting." In the approach area, Arundel encountered a ledge of hard rock which it determined should be blasted instead of dredged.[3] This was discussed with Gibbs and, at Gibbs' request, an estimate was made as to the comparative cost of blasting and of dredging the material without blasting. Arundel's superintendent estimated that it would cost about $12,000 to drill and blast the 12,000 cubic yards of rock and would take about three days to clear it out after it had been blasted. He further estimated that if the rock were not blasted it would be necessary to operate the dredge at a slower rate of speed and it would take about seven days to dredge the rock out.[4] The estimated cost in either event would be about the same amount. Since it appeared that there would be no appreciable difference in the cost of removing the rock whether it were drilled and blasted or dredged without blasting, Gibbs elected not to blast and so instructed Arundel. Thereafter, the entire approach channel, including the 12,000 cubic yards of rock, was dredged without blasting.

In its complaint, Arundel alleged that due to this agreement with Gibbs it undertook to, and did, remove the rock entirely by dredging and that it was required to, and did, operate its dredge under this agreement for seven additional days over and above the time it would have been necessary to use the dredge if blasting had been resorted to. The trial court found that ten days' dredging was required to finish the job after the date Gibbs notified Arundel of its election not to blast and, subtracting the three days estimated to be the time which would have been required if the rock had been blasted, found that seven days additional dredging time was necessitated by the failure to accept Arundel's recommendation to drill and blast. Based upon this finding the court allowed this claim.

An examination of the record discloses that this finding is based upon Arundel's estimate made prior to the actual dredging of the approach area upon which the decision not to blast was made. The fact is, however, that it did not take ten days operational time to dredge the entire approach channel and actual experience proved that the estimate was incorrect. The approach channel, including the 12,000 cubic yards of rock, was dredged of 29,598 cubic yards of material in a total of less than 6 days operational time. This exceeded the time estimated for the removal of the rock if it had been drilled and blasted by only 2 days and a few hours. The record furnishes no basis for a finding of how much of

---

3. The contract contained a provision that if drilling and blasting or dobey blasting should be found advisable to break up any hard ledges of rock, this operation would be done at Gibbs' expense. It did not stipulate who would be responsible for such work or who was to make the final determination as to whether blasting was advisable.

4. The testimony of Arundel's witness on this point is not altogether clear. He testified that he reported that without blasting the cost would be $21,840, (7 days at $130 per hour). The cost of blasting, $12,000, plus three days' dredging, (3 days at $130 per hour), would cost approximately $21,000. This indicates that only 4 days additional dredging would be necessary if the rock were not blasted. The fair import of his testimony considered as a whole indicates that it would have required only four days more dredging if blasting were not resorted to, according to the estimate he gave Gibbs.

this time was spent dredging the rock and how much was spent dredging the remaining 17,598 cubic yards of material. To sustain its right to recovery for additional time, Arundel could not rely only on the acceptance of the alternative of dredging at a slower rate in lieu of blasting. By an acceptance of this alternative, Gibbs became liable only to compensate Arundel for operational hours which actually accrued by the dredging of the rock and we perceive no basis for imposing this claim as an extra charge against Gibbs. We therefore conclude that the trial court erred in awarding Arundel recovery upon this item of its claim. Certainly it is that, since the entire approach channel required less than 6 days operational time, the conclusion of the trial court that Arundel was entitled to recover for "7 additional days" can not be upheld. It is true that during the ten days the dredge was operating in the approach channel it experienced a number of breakdowns which account for the total time required to complete the project. However, such time was not compensable under the contract, since it provides that stoppage of dredging for 30 consecutive minutes or more due to breakdown shall not be deemed operational time.

It follows from the above that the judgment of the trial court which allowed recovery to Arundel for the extra or additional compensation claim should be reversed and that upon the remand of the case hereby ordered, the judgment should be modified accordingly.

 The remaining points presented by this appeal relate to the denial of Gibbs' counterclaim with reference to the collapse of its new steel bulkhead and its wooden bulkhead which were adjacent to the area which was dredged. Gibbs contended that the steel bulkhead collapsed because Arundel either undercut it or cut so close to it at a depth in excess of that called for in the specifications that its foundation was undermined. It contended that Arundel caused the collapse of the wooden bulkhead either by deviating from the specifications or by permitting its swinging anchor chain to come in contact with it in such a manner as to cause it to collapse. Arundel denied that it was negligent in any respect, but attributed the collapse of the bulkheads to structural defects. It contended further that the wooden bulkhead collapsed because of faulty engineering on the part of Gibbs. The parties each offered evidence in support of their respective views. The court found that Gibbs had failed to show by a fair preponderance of the evidence that the operation of the dredge had any causal connection with the collapse of the steel bulkhead. As to the wooden bulkhead, the court found that Gibbs had failed to show that it was damaged by the swinging anchor line and accepted the testimony of one of Arundel's witnesses to the effect that its collapse was the result of faulty specifications furnished by Gibbs.

The burden was upon Gibbs to show that Arundel was negligent and that its negligence was a proximate cause of the loss of the bulkheads. Our consideration of the record leads us to the conclusion that Gibbs did not sustain this burden. The evidence discloses that the bulkheads did collapse from one or more of a number of possible causes, but does not demand a finding that Arundel was negligent in any respect. The question of the weight of the evidence was for the trial court and in reviewing its findings we must assume that the conflicts in evidence were resolved in favor of Arundel.

We affirm the judgment insofar as it denies recovery for the collapse of the bulkheads.

Judgment affirmed in part and in part reversed.